No. 14,943.

IWERKS *v.* THE PEOPLE.
(120 P. [2d] 961)

Decided December 15, 1941.   Rehearing denied January 12, 1942.

Mr. JOEL E. STONE, for plaintiff in error.

Mr. GAIL L. IRELAND, Attorney General, Mr. H. LAWRENCE HINKLEY, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

*En Banc.*

MR. CHIEF JUSTICE YOUNG delivered the opinion of the court.

PLAINTIFF in error was convicted of the crime of burglary in the district court, and seeks a reversal.

One Alfred Krogh had been missing grain and ground corn from a granary inside his barn. He installed a burglar alarm and connected it in such manner that when the granary door was opened it would sound a bell in his bedroom. The testimony discloses that on the night of March 7, 1940, the granary was closed and the door wired shut. At about two o'clock in the morning of March 8, 1940, the alarm sounded. Krogh took a shotgun, went to the bunkhouse, aroused his hired man, Jorgensen, and told him when he gave the word, to turn on the 100-watt light which was located outside and above the door of the barn. When Jorgensen switched on the light at the time directed, Krogh saw a man with a sack of ground corn on his shoulder approaching the corral fence which was an extension of one side of the barn and ran at right angles to the other. Krogh called to the man to stop, and fired his gun in

the air. The man threw the sack over the fence into the corral, and started to climb over the fence into the corral. As he had his hands on two posts at the end of the feed trough which was immediately across the fence, the fence making one side of it, Krogh fired again and at the man's legs. The man disappeared over the fence into the corral. Krogh and Jorgensen then examined the granary and found the door open, after which they procured a car and drove to a neighbor's house to call the sheriff by phone. Krogh testified positively that the man whom he saw, and at whom he shot, was defendant. Defendant lived in the same neighborhood as Krogh and the latter had known him for some fifteen or twenty years. Jorgensen did not see the man in the yard. Approximately one-quarter of a mile from the corral and barn, Krogh and Jorgensen, on their way to call the sheriff, saw defendant Iwerks getting into his car, a Chevrolet sedan, and they later passed the car parked at the entrance of the Arapahoe Iron Works. The next morning, Krogh and Jorgensen, and later in the day a member from the sheriff's office, followed tracks in the mud and snow from the corral to the point where the Chevrolet car was seen standing the night before. Krogh and Jorgensen made a mental note of the license number of the car in order to report it to the sheriff, and upon checking it, it proved to be the license number belonging to defendant.

The following morning, at about 9:30, a deputy sheriff, after having made in his notebook a diagram of the impression made by the overshoes or rubbers in the snow, went to defendant's home where he found a pair of overshoes which corresponded to the tracks they had found. Defendant was not arrested until later in the day, at which time the overshoes they had seen earlier, had disappeared.

When the sheriff and his deputy arrived on the premises, defendant's wife first stated that he was not at home, but later admitted that he was, stating that he

was ill. On entering the house, the sheriff found defendant in bed wearing his underclothing, and he stated that he had been ill and was having chills. He then put on his socks while covered with the bed clothing, and called for two safety pins with which to pin them to his underwear. When he emerged from the bed there was a bulge, or bandage on his left leg, of which the officers made no examination at the time. Defendant was unable to stand, and required assistance to an automobile in which the officers took him to the Colorado General Hospital where the deputy sheriff directed a doctor to make an examination and report on his condition. Up to this time, defendant had said nothing about suffering from any condition other than chills. When his left leg was examined, thirteen marks, such as would be made by shot from a gun were disclosed, which were seen by both the deputy sheriff and the doctor. Four marks of a similar kind were found in his left hand. The doctor, in the presence of the deputy and the defendant, and in response to the deputy's question as to what the wounds were, stated that they were shot wounds. Defendant denied this statement, saying that they were scratches caused by barbed wire which he had used the night before while assisting his son in starting a stalled truck. The son testified that the truck, while they were attempting to extricate it from the mud by means of barbed wire wrapped around the wheels to give them traction, ran over his father's leg.

Defendant did not take the witness stand, but introduced testimony tending to contradict that produced by the people.

All of the errors assigned which we deem it necessary to consider, may be comprehended in three propositions, namely: (1) Whether there was sufficient evidence to identify the defendant as the perpetrator of the offense; (2) whether the testimony of the deputy sheriff as to what he observed and the conversation between himself, the doctor and the defendant at the hospital, was ad-

missible, it being asserted that the evidence was hearsay and the communications privileged; and (3) whether the instruction on circumstantial evidence tendered by defendant should have been given.

That there was clear, positive and direct evidence identifying defendant as the person engaged in the burglary, is apparent from the record and testimony herein set forth, and there is a mass of circumstantial evidence corroborating the direct evidence. With direct evidence tending to establish the burglary and identity of defendant as being present and engaged in it, it was not necessary that the jury be satisfied from circumstantial evidence of defendant's guilt beyond a reasonable doubt, but merely that it be so satisfied from a consideration of all the evidence, both direct and circumstantial. The jury was so instructed. There was no error in the refusal of the court to give defendant's tendered Instruction No. 1 on circumstantial evidence; nor do we find the record lacking in evidence to establish the commission of the crime of burglary and the identity of defendant as the perpetrator of that crime.

We are of the opinion also that there was no error in the admission in evidence of the deputy sheriff's statements concerning what took place, what he observed, and what the conversation was at the hospital between 'the doctor, the defendant, and himself. The law applicable to such a situation has been variously stated by law writers and courts as follows:

"Where a conversation between a physician and patient takes place in the presence and hearing of a third person, such third person may testify as to what was said." 70 C.J. 449, §606d.

"In fact, where such third persons are casually present at a meeting of physician and patient, and are known to be present and not present to assist in treatment, there is no rule of law which prevents such third persons from testifying to things heard or observed. Where, under such circumstances, it is plain that what was said or

done was not intended to be confidential, even the physician may testify. But even though third persons are present, if the patient regards the communication or information or disclosure as confidential, the physician may not testify.

" 'The privilege attaches,' says one court, 'notwithstanding the presence of third persons; and, while as to such a communication made in the presence of others, and such other persons be not necessary to enable the patient and the physician to communicate with each other, such third persons may be admitted to testify concerning the communication, yet the privilege still exists so far as to exclude the testimony of the physician, and the patient as well, from divulging such communications as a witness.'

"This rule is supported by the weight of authority with regard to the analogous privilege of communication between attorney and client, and by parity of reason appears applicable. It is not the presence of third persons which destroys the privilege, but the fact that no rule precludes third persons from testifying. The evidence may thus be received despite the privilege." Jones Commentaries on Evidence; second edition, volume 5, page 4178.

"This privilege applies to physician and patient, and does not include a third person who might be present, unless such third person is aiding the physician, or is necessary as a means of communication between physician and patient." *Mullin-Johnson Co. v. Penn Mutual Life Ins. Co.,* (1933) 2 F. Supp. 203, 204.

"It is settled law that if parties sustaining confidential relations to each other hold their conversation in the presence and hearing of third persons, whether they be necessarily present as officers or indifferent bystanders, such third persons are not prohibited from testifying to what they heard. *Cotton v. State,* supra; *House v. House,* 61 Mich. 69; *In re McCarty,* 55 Hun, 7; *Commonwealth v. Griffin,* 110 Mass. 181; *Hoy v. Morris,* 13 Gray, 519;

*Oliver v. Pate,* 43 Ind. 132 (142); Wharton Crim. Ev., section 398; 1 Lawson's Rights and Rem., section 147." *Springer v. Byram,* 137 Ind. 15, 23, 36 N.E. 361, 23 L.R.A. 244.

Judgment affirmed.