No. 37,533

THE STATE OF KANSAS, *Appellee*, v. JOSE CLIOFAS AGUIRRE (also known as Joe Aguirre), *Appellant*.

(206 P. 2d 118)

Opinion filed May 7, 1949.

*Edward Rooney*, of Topeka, argued the cause, and *Jacob A. Dickinson* and *David Prager*, both of Topeka, were with him on the briefs for the appellant.

*Warren W. Shaw*, county attorney, argued the cause, and *Harold R. Fatzer*, attorney general, *William L. Rees* and *Herbert A. Marshall*, assistant county attorneys, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: Appellant was charged in the district court of Shawnee county by an information in due form of murder in the first degree of Trinidad Alejos. A trial by jury found him guilty

of murder in the second degree. His motion for a new trial was overruled, he was sentenced to imprisonment for ten years, and he has appealed.

The evidence offered by the state, which the jury were authorized to believe, may be summarized as follows: Trinidad Alejos, a Mexican, twenty years of age, was married, his family consisting of his wife and one child. Jose Aguirre, also a Mexican, was a single man, forty-seven years old, who made his home with his mother and stepfather. They and other Mexicans lived in the vicinity of the Santa Fe shops, where the men were employed. The Spanish Village is located at the northwest corner of First and Jefferson streets in Topeka. It is a stucco building, about twenty feet wide and thirty-six feet long. It is a beer parlor where persons of Mexican extraction congregate to drink beer, visit and find entertainment. The front was well lighted. On Saturday, January 31, 1948, the ground was covered with snow. Trinidad Alejos did not work that day, as it was his day off. He spent the day with his family and on various errands. He went to the Spanish Village early in the evening, but soon left and returned about 11:00 p. m. His uncle, Louis Alejos, worked that day until about 9:00 p.m., when he left in order to complete plans for a birthday surprise party for his wife to be held the next morning. He visited the Spanish Village at various times to invite some of his friends whom he knew he would find there. He returned to the Spanish Village about 11:00 p. m. John Torrez early that evening had met Aguirre at a beer tavern known as the Paradise Inn and at the request of Aguirre went with him in his truck to a place on California Avenue where Aguirre wished to purchase a hunting license. The place was closed and they returned to the Paradise Inn. From there Torrez, driving his own automobile, went to the Spanish Village about 11:00 p. m. and parked his car on the west side of Jefferson street a short distance south of the Spanish Village. At that time there were perhaps twenty or thirty persons in the Spanish Village. About 11:30 p. m. Aguirre arrived at the Spanish Village and joined a group of men who were drinking beer at the bar near the north end of the building. In the group near Aguirre were Torrez, Refugio Granada and Trinidad Alejos. All the men there were drinking beer. None of them was drunk. Louis Alejos was in a booth on the west side of the building with Jose Sanchez and his wife, talking about the party he was to give the following morning. The men near the bar

were buying beer for their friends and Louis Alejos went to the bar to get a beer someone had purchased for him. He noticed Aguirre standing near the bar. His back was to Louis Alejos. As Louis reached for his beer Aguirre turned toward him and said: "I am not afraid of nobody." Louis Alejos said to Aguirre, "That is all right." Aguirre then said: "If I go home and come back I will show you." Louis Alejos replied: "That is all right, too." Neither of them appeared to be angry. There had been no arguments, threats or fights, or other disturbances in the Spanish Village that evening and no one had abused or attacked Aguirre. There had been no display of weapons of any kind. Aguirre left the Spanish Village about 11:40. None of the men standing near the bar with whom he had been drinking left at that time, nor did anyone follow him out of the building after he left. Aguirre lived on the east side of Jefferson street a short distance north of the Spanish Village, perhaps 150 feet away. After Aguirre left the Spanish Village Torrez, Granada, Trinidad and Louis Alejos continued to drink their beer, but about midnight Torrez agreed to drive the group to Oakland, in the northeast part of Topeka, in order that Louis Alejos could engage some musicians to play at his party the following morning. Shortly after midnight the four men left the Spanish Village to enter the Torrez car. Torrez was the first to leave the Spanish Village, followed by Trinidad Alejos, Granada and Louis Alejos, in that order. They proceeded east onto the parking and then south toward the car. As Louis Alejos was leaving the Spanish Village and was on the steps leading to the sidewalk Aguirre was seen approaching from the direction of his home toward the Spanish Village. He called and said something about having "it" now. What this referred to is not shown. At that time Aguirre was about fifteen feet northeast of the door of the Spanish Village and was walking rapidly toward it. As Louis Alejos continued down the steps onto the sidewalk he noticed Aguirre had taken a gun from his pocket and had it in his right hand, and he said to Aguirre, "Wait a minute," and took a step toward Aguirre, who said, "Stop or I'll burn you." Louis Alejos took another step toward Aguirre, at which time Aguirre started shooting. Aguirre was then fifteen to twenty-five feet north of Louis Alejos and approximately the same distance from the other three men—Granada, Torrez and Trinidad Alejos. Aguirre shot three times in rapid succession at Louis Alejos, each shot taking effect, but none of them produced a serious in-

jury. Aguirre then turned his gun to the east and shot Trinidad Alejos twice. During the few seconds of the shooting all the men were standing still. Upon being shot Trinidad Alejos fell immediately and soon thereafter died from the gunshot wound received. Louis Alejos said to Aguirre: "See what you did to my nephew," and started walking slowly toward Aguirre, who turned the gun back on Louis Alejos, but the gun did not fire. Louis Alejos continued in a slow walk until he reached Aguirre and reached for the gun, but missed it. Aguirre hit Louis Alejos several times over the head with the gun. Louis Alejos grappled with Aguirre and both men fell to the ground, struggling for the gun, which Louis Alejos finally took away from Aguirre, and while on top of him struck Aguirre on the head three or four times. While this was being done the gun fired and the bullet entered the bony region near the mastoid in the back of the head of Aguirre. Aguirre and Trinidad Alejos were taken away from the scene in ambulances, Aguirre to Christ's Hospital, where Louis Alejos was taken later by the police. At the hospital both men received treatment from Dr. Charles Joss, who was on emergency call at the hospital.

The next morning, about 9:00 o'clock, Jerome Brown, a detective of the police department, went to the hospital and talked to Louis Alejos and Aguirre. He then contacted the county attorney and requested him to come to the hospital. The county attorney called an official court reporter of the district court and about 10:00 o'clock a. m. he, the reporter and Brown, after talking to the nurse in charge, went to the room of Aguirre and found that he was awake. The county attorney introduced himself, the reporter and Brown, and asked Aguirre in regard to the happenings of the previous night. The questions were asked in English and the answers made in English. Defendant had no trouble understanding the questions or making answers because of the use of English. In answer to questions defendant told of the events of the preceding night and contended that he shot because of being attacked by the men in front of the Spanish Village. Briefly stated, it was a story of self defense. After talking to Aguirre the county attorney also talked to Louis Alejos in regard to the happenings of the preceding night. Later that day the injured men were transferred to the Santa Fe Hospital.

At the trial the defendant took the stand and testified in his own behalf. His testimony was in support of the theory of self

defense, and perhaps tended to indicate that the shooting of Trinidad Alejos was untintentional. In some details his testimony differed from his statements at the hospital on February 1. For example, there he stated that after his talk with Louis Alejos at the Spanish Village he went home and got his gun and put it in his pocket and came back. In his testimony in court he said that he didn't go home for his gun, but that he had had the gun in his pocket before he left the Spanish Village shortly before midnight. In other details his story differed. On cross-examination the county attorney called his attention to those differences and asked him if he had not stated differently at the time he was questioned at the hospital. Defendant objected to the reference to his statement at the hospital upon the ground that the statement at the hospital was in the nature of a confession or admission against interests and upon the ground that defendant was unconscious at the time and did not even realize he was in the hospital. The court then excused the jury and both the state and defendant introduced witnesses to show the condition of defendant at the time the statements were made.

The county attorney, the court reporter, Mr. Brown, Doctor Joss, the nurse and the priest who saw Aguirre about 3:00 or 3:30 o'clock in the morning, gave testimony before the court in the absence of the jury, which testimony pertained to the physical and mental condition of Aguirre, particularly at the time the statement was taken in the hospital on February 1. The county attorney made it clear to the court that his questions pertaining to that statement were asked for the purpose of impeachment. The court held the evidence to be competent. The jury was called and the cross-examination of the defendant proceeded. In the course of that the county attorney asked defendant if he had not made certain statements when questioned at the hospital which differed in some respects from the testimony he had given on the trial. His answers in each case were that he did not remember, or that he did not know whether the question was asked, and perhaps in some instances he positively denied that he had made the statements. The county attorney then planned to offer that portion of the statement concerning which the witness had been questioned. In doing so he advised the court that counsel for defendant insisted that if any part of the statement went in that it should all go in. Counsel

for defendant confirmed that without waiving his original objections, and the statement was admitted in evidence.

The principal questions relied upon by appellant for reversal pertain to the statement made by defendant at the hospital on February 1, 1948. Appellant contends the court erred in admitting the statement in evidence. As previously noted, the state introduced the statement in evidence only upon the insistence of counsel for defendant after certain questions and answers therein had been called to the attention of the defendant for the purpose of impeaching or discrediting his testimony. Hence, counsel for appellant cannot blame the state for introducing the entire statement in evidence. In urging that be done counsel for defendant did so without waiving their objections previously made to the particular statements therein. The objection previously made was upon the ground that defendant was unconscious at the time the statement was made. This ground of objection appears to have been thoroughly disproved. Counsel for appellant here do not contend the defendant was unconscious at that time.

Appellant contends the court erred in treating the statement as a confession. The difficulty with that contention is that there is nothing in the record to indicate that the court treated the statement as a confession. Clearly it was not a confession, but on the other hand it was exculpatory in character and was a statement tending to show the shooting was prompted or necessitated for the defense of defendant's own person and would be generally classified as showing self-defense. The record indicates it was substantially the same as the testimony of the witness in chief when testifying in his own defense. It differed from his testimony only in certain details. There is no more reason to characterize it as a confession than to so characterize his testimony in chief when he was a witness. (See *State v. Smiley, ante*, p. 261; *State v. Myers*, 154 Kan. 648, 121 P. 2d 286, citing *State v. Campbell*, 73 Kan. 688, 85 Pac. 784; *State v. Turner*, 82 Kan. 787, 109 Pac. 654, and other authorities. See, also, Wigmore on Evidence, § 821; 22 C. J. S. 1420, 1422; 20 Am. Jur. 417, and cases there cited.)

The case is unlike *State v. Seward*, 163 Kan. 136, 181 P. 2d 478, cited and relied upon by appellant. In that case there had been a definite confession of guilt. In *State v. Hayes*, 106 Kan. 253, 187 Pac. 675, cited by appellant, there was a written confession and the question was whether it was voluntarily made. The trial court held it was so made, and this court affirmed.

It is well settled, of course, that where the defendant in a criminal case testifies in his own behalf he may be cross-examined upon statements previously made by him respecting the matter concerning which he had testified for the purpose of impeachment or of testing his credibility.

Complaint is made of the refusal of the court to give a requested instruction as to how the jury should consider the statement made by defendant on February 1 at the hospital. We see no occasion for a particular instruction upon that question, and the wording of the one requested might very well have been construed less favorably to the defendant than his counsel desired. Counsel cite no authority in support of the view that their particular instruction should have been given. The statement had been referred to by the county attorney only for the purpose of tending to impeach the witness. The court specifically instructed the jury with reference to how to consider impeaching testimony and stated to the jury:

". . . it is your province to determine to what extent that fact tends to impeach . . . the credibilty of the witness . . . or to detract from the weight to be given to his testimony."

There was no objection to instructions given, but we have examined them with care and find that they fairly presented the issues to the jury and in all instances placed the burden of proof, beyond a reasonable doubt, upon the state. The jury was specifically told that if the state failed to prove the various elements necessary for a conviction to their satisfaction and beyond a reasonable doubt they should acquit the defendant. In view of what we have said about the instruction requested and in view of the instructions given we feel compelled to hold that the court did not err by refusing to give the particular instruction requested.

Doctor Joss was called as a witness in rebuttal and testified that he was on emergency call when appellant was brought to the hospital and to the emergency room, and attended him on that occasion; that it was his duty to take care of any patient who came into the hospital for emergency treatment who did not have a physician of his own or was in such condition that he could not call a physician; that he observed appellant on that occasion and observed the smell of liquor upon his breath; that the appellant vomited and the witness observed that the vomit smelled very strongly of alcohol. This testimony was objected to upon the ground that it was privileged. The objection was overruled and

complaint is made of that ruling. Appellant argues that the admission of this testimony was in violation of our statute (G. S. 1935, 60-2805, *Sixth*). We had the same question before us in *State v. Townsend*, 146 Kan. 982, 73 P. 2d 1124, where it was held:

"Our statute (G. S. 1935, 60-2805) relating to the privilege of the testimony of one's physician pertains to matters germane to the physician's diagnosis and treatment of the patients." (Syl.)

That case was a prosecution for fourth degree manslaughter by culpable negligence in driving a car so that another person was killed. The defendant and his wife were injured in the collision and were taken to a hospital, where the doctor treated both of them, for which treatment he presented a bill, which was paid. It was held this "did not render the doctor or his nurse incompetent to testify, over appellant's objection, that they observed him while he was at the office and that in their opinion he was under the influence of intoxicating liquor." The authorities supporting the court's decision are set out in that opinion and the same are referred to here as supporting our conclusion in this case. The Townsend case, with others, is cited in 58 Am. Jur. 243, in support of the text stating the general rule in harmony with our decision. Counsel for appellant cite and rely upon *Linscott v. Hughbanks*, 140 Kan. 353, 37 P. 2d 26; but in that case the physician's evidence sought to be introduced clearly related to diagnosis and treatment. That was so ruled in the Townsend case, *supra* (p. 986).

Belatedly, in their brief (not in their abstract) counsel for appellant assigned as error the alleged abuse of discretion of the trial court in permitting the county attorney to continue as an attorney in the case after he had testified before the court (not in the presence of the jury) concerning the circumstances under which the statement was made at the hospital on February 1. When the trial of the case was resumed before the jury no objection was made to the county attorney continuing to appear in the case on behalf of the prosecution. Neither was the question raised in any other manner in the trial court. Hence, counsel for appellant are not in position to have it considered now. More than that, counsel for defendant had questioned the propriety of the county attorney taking the statement. Under the circumstances it was appropriate for the county attorney, either by his testimony or by a statement before the court, to explain the circumstances under which this statement was made. There was no objection to his doing so.

There is but little, if any, excuse for injecting this question into the record here.

We find no error in the record. The judgment of the court below is affirmed.