The PEOPLE of the State of Colorado,
Plaintiff-Appellee,

v.

Thomas Eugene DEADMOND,
Defendant-Appellant.

No. 82SA367.

Supreme Court of Colorado,
En Banc.

May 21, 1984.

Opinion Modified, and as Modified,
Rehearing Denied June 11, 1984.

**764**

J.D. MacFarlane, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Joel W. Cantrick, Sol. Gen., John Milton Hutchins, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Banowetz, Liggett & Moore, Thomas H. Moore, Fort Collins, for defendant-appellant.

KIRSHBAUM, Justice.

Defendant, Thomas Gene Deadmond, appeals his jury conviction of vehicular homicide under section 18–3–106, 8 C.R.S. (1973 & Supp.1983).[1] We affirm in part, reverse in part, and remand for further proceedings.

I

The record reveals the following pertinent facts. On May 15, 1980, on a highway near Loveland, Colorado, defendant drove his pickup truck into a car driven by Sharon Kay Bakovich. Both drivers were taken by paramedics to a Loveland hospital, where defendant was treated by Dr. Michael J. Jobin for a laceration on his chin. Sharon Bakovich died later that evening.

Before the extent of Sharon Bakovich's injuries was known, Officer Joseph Berdin of the Loveland Police Department, pursuant to section 42–4–1202(3), 17 C.R.S. (1973),[2] advised defendant of his rights un-

---

1. Section 18–3–106(1)(b)(I) provides:

 "If a person operates or drives a motor vehicle while under the influence of any drug or intoxicant and such conduct is the proximate cause of the death of another, he commits vehicular homicide. This is a strict liability crime."

2. The implied consent law, sections 42–4–1202(3)(a) & (3)(c), 17 C.R.S. (1973), as applicable at the time of the accident stated as follows:

 "(3)(a) Any person who drives any motor vehicle upon a public highway in this state shall be deemed to have given his consent to a chemical test of his breath, blood, or urine for the purpose of determining the alcoholic content of his blood, if arrested for any misdemeanor offense arising out of acts alleged to have been committed while the person was driving a motor vehicle while under the influence of, or impaired by, alcohol. If such person requests that the said chemical test be a blood test, then the test shall be of his blood; but, if such person requests that a specimen of his blood not be drawn, then a specimen of his breath or urine shall be obtained and tested, the election to be made by the arresting officer.

 . . . .

 (c) If any person who has been so arrested refuses to submit to a chemical test when requested by the arresting officer, as provided in this subsection (3), the test shall not be given."

 In 1983, the General Assembly repealed § 42–4–1202(3) in its entirety and reenacted the statute

der the implied consent statute and asked defendant to submit to a chemical test to determine the alcohol content of his blood. Defendant refused to take the test. When he learned that Sharon Bakovich was not expected to live, the officer ordered a blood test sample to be taken from defendant. An information charging defendant with vehicular homicide was subsequently filed. Prior to trial, defendant moved to dismiss the case on the ground that the vehicular homicide statute is unconstitutionally vague. He also moved to suppress the blood sample taken from him at the hospital. The trial court denied both motions.

At trial, Dr. Jobin was called as a witness during the prosecution's case-in-chief. When defendant objected that the doctor's testimony violated the physician-patient privilege, an *in camera* hearing was held to evaluate the testimony. At the hearing Dr. Jobin testified that when he arrived at the hospital emergency room defendant announced that he did not need any treatment, but that defendant "had an odor of alcohol on his breath ... and because of that and his very hostile, aggressive, almost bizarre b[e]havior at times, I took it upon myself to really try to examine [defendant] carefully." He further stated that various policemen and staff members were in the emergency room during this entire time, and gave the following testimony:

> In the process of examining his nervous functions, I asked him about his alcohol consumption. That is a very important factor in determining whether somebody has had a head injury or whether they are acting under the influence of other drugs or alcohol. And he did admit to drinking, he told me between five and ten beers.

On cross-examination of Dr. Jobin, the following pertinent exchanges occurred:

Q You were taking into consideration in treating [defendant] his behavior and his manner of acting, that had medical significance, didn't it?
A It did.

. . . .

Q All information that comes to you, you take into account in treating a patient?
A That's a matter of living, being an emergency room doctor. My eyes are open to everything that happens in the emergency room, and that always enters into any treatment.

. . . .

Q Nothing is trivial, and [defendant's] condition was not trivial, and certainly in your mind you took into consideration all the factors in considering the diagnosis of [defendant's] condition?
A That's right.

At the conclusion of the hearing the trial court ruled that Dr. Jobin could testify about his "physical observations" of defendant, but that he could not testify "concerning the answer to his inquiry concerning the consumption of alcohol." In testifying before the jury, Dr. Jobin essentially repeated his *in camera* testimony. He further stated that on the night in question defendant was "definitely impaired by the use of alcohol" and that defendant's "demeanor and attitude and behavior" could be attributed "partially to the use of alcohol." Defendant did not object to these specific statements.

Defendant testified at trial that at approximately noon on May 15, 1980, he "had a beer or two" at a bar; that he left the bar for a period of time and then returned at approximately 3:30 p.m.; and that he remained there until 8:00 p.m. Defendant estimated that he had consumed as many as five beers during this time, and acknowledged that on the day of the accident he told police officers that he had consumed "three or four beers" prior to the collision.

On cross-examination, the prosecution asked the following question of the defendant: "Isn't it a fact that you told the doctor who was examining you that you had be-

with amendments. *See* Ch. 476, § 2, 1983 Colo. Sess.Laws 1631, 1631–33.

tween five and ten beers to drink?" Defendant objected on the basis of the physician-patient privilege. The trial court overruled the objection, and defendant answered as follows: "I don't remember saying it."

Defendant was found guilty of vehicular homicide. Following a sentencing hearing,[3] defendant was placed on probation for a period of four years. As a condition of probation, defendant was ordered to pay $9,600 to Sharon Bakovich's husband. This appeal followed.[4]

## II

Defendant first contends that his refusal to consent to a chemical analysis of his blood pursuant to the implied consent law precluded the performance of such test. However, consent is not a prerequisite to the performance of a chemical test to determine the alcohol content of a defendant's blood when the offense charged is a felony rather than the lesser offense of driving under the influence of alcohol. *People v. Sanchez*, 173 Colo. 188, 476 P.2d 980 (1970). *See also People v. Duemig*, 620 P.2d 240 (Colo.1980), *cert. denied*, 451 U.S. 971, 101 S.Ct. 2048, 68 L.Ed.2d 350 (1981); *People v. Myers*, 198 Colo. 295, 599 P.2d 891 (1979). The trial court, therefore, correctly concluded that evidence of the chemical test was admissible even though obtained without defendant's consent.

## III

Defendant next contends that the term "proximate cause" as used in the vehicular homicide statute is unconstitutionally vague. In *People v. Rostad*, 669 P.2d 126, 128 (Colo.1983), we concluded that the requirement of proof of "proximate cause" in section 18–3–106 "is sufficiently intelligible to satisfy both federal and Colorado constitutional standards of

due process of law." That decision is dispositive of this issue.

## IV

Defendant argues that the trial court's definitional instructions on strict liability were insufficient to properly define the culpability element of vehicular homicide. We agree that the trial court erred, but conclude that such error was harmless in the circumstances of this case.

In *Rostad*, we examined "strict liability" crimes defined by our General Assembly and concluded that "the minimal requirement for a 'strict liability' offense is proof that the proscribed conduct was performed voluntarily—*i.e.*, that such act must be the product of conscious mental activity involving effort or determination." 669 P.2d at 129. We also concluded that the prosecution has the burden of proving voluntary conduct in the operation of a motor vehicle to secure a conviction of vehicular homicide, and noted that, when properly requested by a defendant, a trial court "must instruct the jury with respect to the minimum requirement for criminal liability and the definition of a voluntary act." *Id.* at 130 n. 5.

Instruction No. 9 given the jury stated in pertinent part as follows:

The crime of Vehicular Homicide charged in the Information is one of strict liability. Intent to commit the crime need not be shown, only intent to act. The voluntary commission of the forbidden act constitutes the crime charged.

. . . .

"The requirement for criminal liability of [vehicular homicide] is the performance by a person of conduct which includes a voluntary act or the omission to perform an act which he is physically capable of performing.

---

3. Sentencing hearings were held July 7 and July 31, 1981. Transcripts of these hearings were not made part of the record on appeal.

4. This case was transferred from the Court of Appeals because of an asserted challenge to the constitutionality of § 18–3–106, 8 C.R.S. (1973 & Supp.1983). *See* §§ 13–4–102(1)(b) and 13–4–110(1)(a), 6 C.R.S. (1973).

This instruction was based on CJI–Crim. 6:3, relating to strict liability crimes.[5] The "Notes on Use" pertaining to that model instruction suggest that when it is given, the terms conduct, voluntary act, and omission are also to be defined for the jury. In Instruction No. 10, the trial court defined certain words and phrases as follows:

> Concerning the charge of Vehicular Homicide in this case certain words or phrases have a particular meaning.
>
> The following are the definitions of these words and phrases.
>
> Act means bodily movement, and includes words and possession of property.
>
> Motor Vehicle includes any self-propelled device by which persons or property may be moved, carried, or transported from one place to another on or in land, water, or air, except devices operated on rails, tracks, or cables fixed to the ground or supported by pylons, towers, or other structures.
>
> Operate and Drive means every person who drives or is in actual physical control of a motor vehicle upon a highway.
>
> Proximate Cause means that cause which, in natural and continued sequence, unbroken by any efficient intervening cause, produced the alleged death

and without which that result would not have occurred.

Defendant objected to Instruction No. 9 on the grounds that it was vague, that it was inconsistent with other instructions, and that, when considered in conjunction with an instruction which defined certain presumptions concerning levels of blood alcohol content,[6] it in effect directed the jury to enter a guilty verdict. Defendant objected to Instruction No. 10 asserting that it failed "to set out the proper definitions as required." Defendant also objected "to the definition of 'proximate cause' as given in Instruction No. 10 in that such definition is nowhere contained in our statutes." Defendant did not, however, tender any instructions containing definitions of any particular word except instructions dealing with "proximate cause" and "intervening cause."

■■■ Defendant now contends that the trial court erred in failing *sua sponte* to define the terms "voluntary act," "conduct" and "omission." At trial defendant did not object to the failure to define those specific terms and, as we have indicated, did not tender any instructions defining "voluntary act," "conduct" or "omission." Instruction No. 10 does contain the definition of the word "act," to which definition defendant did not and does not object. While the better practice, as suggested by

---

**5.** The Colorado Supreme Court Committee on Criminal Jury Instructions revised the model instruction regarding strict liability crimes effective January 1, 1983. The present model strict liability instruction now appears at CJI–Crim. 6:02.

**6.** The trial court gave the following instruction regarding statutory presumptions:

> You are instructed that the amount of alcohol in the defendant's blood at the time of the commission of the alleged offense, or within a reasonable time thereafter, as shown by chemical analysis of the defendant's blood shall give rise to the following presumptions: (a) If there was at such time 0.05 percent or less by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was not under the influence of intoxicating liquor.
> (b) If there was at such time in excess of 0.05 percent but less than 0.10 percent by weight of alcohol in the defendant's blood, such fact

may be considered with other competent evidence in determining whether or not the defendant was under the influence of alcohol. (c) If there was at such time 0.10 percent or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of alcohol.

> The presumptions of law as stated in this instruction are rebuttable and do not limit the introduction, reception and consideration of any other competent evidence bearing upon the question of whether or not the defendant was under the influence of intoxicating liquor.

> If any of the evidence in this case raises a reasonable doubt in your mind that the defendant was under the influence of intoxicating liquor at the time of the alleged offense you may find that the above presumptions have been rebutted and are therefore not applicable to this case.

the notes on use accompanying CJI–Crim. 6:3, would be to define the phrase "voluntary act" when such phrase is included in instructions relating to alleged strict liability offenses, we find no reversible error here in the trial court's failure to define the word "voluntary" in the absence of a specific request for such instruction. *See People v. Rostad, supra.* The word, while imprecise, is one with which reasonable persons of common intelligence would be familiar, and its meaning is not so technical or mysterious as to create confusion in jurors' minds as to its meaning. *See People v. Ortega,* 181 Colo. 223, 508 P.2d 784 (1973); *Simms v. People,* 174 Colo. 85, 482 P.2d 974 (1971).

■ Similarly, we conclude that the trial court's failure to define *sua sponte* the terms "conduct" and "omission" does not constitute error. Both are words susceptible to general understanding as to their meaning. *See People v. Ortega, supra; Simms v. People, supra.* While the term "omission" has special legal significance, there is no suggestion in the evidence that under any theory of the case some "omission" by defendant caused the victim's death. The instructions as a whole adequately, if not fully, informed the jury of the mental state and conduct applicable to the charges against defendant.

■ Defendant finally asserts as reversible error in the instruction phase of the case the trial court's rejection of instructions defining intervening cause which defendant tendered at trial. To determine whether the jury has been informed of defendant's theory of the case, all the instructions given must be considered together. *Dennison v. People,* 161 Colo. 546, 423 P.2d 839 (1967); *People v. Hoehl,* 629 P.2d 1083 (Colo.App.1980). The definition of proximate cause contained in Instruction No. 9 fully apprised the jury of the nature of the causal connection between conduct and result which the prosecution was required to establish beyond a reasonable doubt. We conclude that the jury was

adequately informed concerning the prosecution's burden of proof, the defendant's theory of the case, and the definition of proximate cause.

**V**

Defendant asserts that the trial court erred in ruling that Dr. Jobin's testimony was not barred by the physician-patient privilege. We disagree.

At common law, confidential information disclosed to a physician was afforded no evidentiary privilege. *McCormick's Handbook on the Law of Evidence* § 98 (E. Cleary 2d ed. 1972). In 1883, Colorado altered the common law rule by adopting legislation establishing a privilege for certain information imparted by a patient to the patient's physician under specific circumstances. Act of February 11, 1883, § 3, 1883 Colo.Sess.Laws 289, 290. *See generally* Quinn, *The Physician-Patient Privilege in Colorado,* 37 U.Colo.L.Rev. 349 (1965). This hundred-year old principle is now codified at section 13–90–107(1)(d), 6 C.R.S. (Supp.1983), as follows:

A physician, surgeon, or registered professional nurse duly authorized to practice his profession pursuant to the laws of this state or any other state shall not be examined without the consent of his patient as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient. . . .[7]

This statute was adopted for the purpose of encouraging patients to fully disclose medically relevant information to their physicians by reducing the possibility of humiliation or embarrassment through subsequent public disclosure of such information by the physician. *Clark v. District Court,* 668 P.2d 3 (Colo.1983); *Community Hospital Association v. District Court,* 194 Colo. 98, 570 P.2d 243 (1977).

■ The privilege afforded by this section is applicable to criminal proceedings in Colorado. *People v. Reynolds,* 195 Colo.

---

7. In 1983, the privilege was amended to cover registered professional nurses. *See* Ch. 173, sec. 1, § 13–90–107(1)(d), 1983 Colo.Sess.Laws 636, 636–37.

386, 578 P.2d 647 (1978). In some jurisdictions, however, such privilege has been declared inapplicable to certain criminal cases involving drunk driving offenses. *See, e.g., State ex rel. M.P.C.*, 165 N.J.Super. 131, 397 A.2d 1092 (1979); *State v. Howard*, 272 N.C. 519, 158 S.E.2d 350 (1968). In *State ex rel. M.P.C.*, the Superior Court of New Jersey summarized the basis for such exception as follows:

> [I]n the usual case, the patient-physician privilege must give way where it conflicts with the sensible administration of the law and policy relating to drunken driving by persons who (1) in an appropriate fashion have been apprehended by the police with probable cause to believe that they have been driving while intoxicated, and (2) have been caused by the police to be taken to an appropriate medical facility for the purpose, among others, of a blood alcohol test. 165 N.J.Super. at 136–37, 397 A.2d at 1095. (citation omitted) (footnote omitted)

While such an exception might well command legislative support, our statute contains no suggestion that the physician-patient privilege is inapplicable to some types of criminal proceedings. *See People v. Reynolds, supra.*[8] The issue, then, is whether the privilege as defined by section 13–90–107(1)(d) applies in the circumstances of this case.

▉▉▉▉▉ To obtain privileged status pursuant to section 13–90–107(1)(d), the information must be acquired by the physician in the course of a professional consultation with his patient. 8 J. Wigmore, *Evidence in Trials at Common Law* § 2382 (McNaughton rev. 1961); Quinn, *supra*, at 353. Moreover, the privilege applies only to information which is necessary to enable the physician to prescribe or act for the patient. *Hanlon v. Woodhouse*, 113 Colo. 504, 160 P.2d 998 (1945); *Cook v. People*, 60 Colo. 263, 153 P. 214 (1915). *See also People v. Reynolds, supra; Continental Investment Co. v. Garcher*, 83 Colo. 239,

264 P. 723 (1928). Whether the observations of a physician or other medical professionals about a patient's level of intoxication is considered information necessary for treatment is an issue which has divided courts and which depends to a large extent on the evidentiary posture of the case. *Compare State v. Raymond*, 139 Vt. 464, 431 A.2d 453 (1981) *and Freeburg v. State*, 92 Neb. 346, 138 N.W. 143 (1912) (observations of intoxication necessary for treatment) *with State v. Aguirre*, 167 Kan. 266, 206 P.2d 118 (1949) *and City of Racine v. Woiteshek*, 251 Wis. 404, 29 N.W.2d 752 (1947) (observations of intoxication not necessary for treatment). *See generally* Annot., 79 A.L.R. 1131 (1932).

▉▉▉▉ The physician-patient privilege, however, like other testimonial privileges, may be waived by the party to whom it is available, either by an express or implied consent to disclose. *Clark v. District Court, supra; Stauffer v. Karabin*, 30 Colo.App. 357, 492 P.2d 862 (1971). *See also* 8 J. Wigmore, *supra*, at § 2388. The burden of establishing a waiver is on the party seeking to overcome the claim of privilege. *Clark v. District Court, supra.* In *Iwerks v. People*, 108 Colo. 556, 560–61, 120 P.2d 961, 963 (1941), this court discussed the principle of waiver of the physician-patient privilege as follows:

> Where a conversation between a physician and patient takes place in the presence and hearing of a third person, such third person may testify as to what was said.
>
> In fact, where such third persons are casually present at a meeting of physician and patient, and are known to be present and not present to assist in treatment, there is no rule of law which prevents such third persons from testifying to things heard or observed. *Where, under such circumstances, it is plain that what was said or done was not intended to be confidential, even the physician may testify.* But even though third

---

**8.** Other jurisdictions are divided on the question of whether the statutory testimonial privilege as to communications between patient and physician is generally applicable to criminal actions. *See generally* Annot., 7 A.L.R.3d 1458 (1966).

persons are present, if the patient regards the communication or information or disclosure as confidential, the physician may not testify. (citation omitted) (emphasis added)

 Here, assuming that defendant's behavior and statements in the emergency room were privileged communications, defendant's abusive language, loud demeanor and offensive behavior, directed at and readily observed and heard by anyone who might be present in the emergency room, could not have been intended by defendant to be confidential. We conclude that such conduct constituted an implied waiver of any physician-patient privilege with respect to the doctor's observations of defendant's behavior. This conclusion is consistent with the purpose of the privilege; defendant could claim neither humiliation nor embarassment in the future beyond the embarassment or humiliation occasioned by the behavior and words he communicated to the public. Thus, the trial court properly concluded that testimony by Dr. Jobin as to his observations of defendant's actions was admissible pursuant to section 13–90–107(1)(d).[9]

Defendant also argues that the trial court erred in permitting the prosecution to impeach him by reference to the comments he made to Dr. Jobin about the consumption of alcohol.[10] We disagree.

 A party who testifies about the details of the service and treatment rendered to him by a physician may waive the physician-patient privilege. *Mauro v. Tracy,* 152 Colo. 106, 380 P.2d 570 (1963); *Kelley v. Holmes,* 28 Colo.App. 79, 470 P.2d 590 (1970). *Cf. Bond v. District Court,* 682 P.2d 33 (Colo.1984) (court held that plaintiffs who injected mental condition into case as the basis of their claim waived psychologist-patient privilege). Application

of this proposition prevents the physician-patient privilege from being transformed into a self-serving shield by the party claiming the privilege. *See McCormick's Handbook on the Law of Evidence* § 103 (E. Cleary 2d ed. 1972). Although during direct examination defendant did not testify about his conversation with Dr. Jobin, he did tell the jury the specific number of beers he had consumed on the night of the accident. He also described his mental condition at the time Dr. Jobin treated him and summarized the treatment he received from Dr. Jobin. Defendant's own testimony, therefore, directly raised the factual issue of the number of beers he had consumed on the evening in question. By raising that issue himself, defendant destroyed any vestige of confidentiality which might cloak that aspect of his conversation with Dr. Jobin, and thus waived the physician-patient privilege with regard to that subject matter for purposes of impeachment.

## VI

Defendant finally contends that the trial court lacked statutory authority to order him to make payments to the deceased's husband as a condition of probation. We agree.

 Section 16–11–101(1), 8 C.R.S. (1973), defines the alternatives available to a trial court in imposing sentence upon a person found guilty of an offense. Section 16–11–101(1)(a) defines probation as one such alternative:

(1) Within the limitations of the penalties provided by the classification of the offense of which a person is found guilty, and subject to the provisions of this title, the trial court has the following alternatives in entering judgment imposing a sentence:

---

9. Having concluded that in the circumstances of this case defendant waived the privilege, we do not consider the question of whether the physician-patient privilege had commenced at the time of defendant's communications. Dr. Jobin's testimony that his observations of defendant's behavior had medical significance for diagnosis and treatment decisions was uncontradicted.

10. As noted in the factual summary, the prosecution merely asked defendant about the statement; Dr. Jobin was not re-called for rebuttal testimony.

(a) The defendant may be granted probation unless the offense of which he is convicted makes him ineligible for probation. The granting or denial of probation and the conditions of probation shall not be subject to appellate review unless probation is granted contrary to the provisions of this title.

Because probation is a legislatively created sentencing alternative, any conditions imposed as terms of probation must be authorized by the General Assembly. *People v. Ledford*, 173 Colo. 194, 477 P.2d 374 (1970). Terms of probation not authorized by statute may be challenged by defendants. *Cumhuriyet v. People*, 200 Colo. 466, 615 P.2d 724 (1980). *See also People ex rel. A.F.*, 192 Colo. 207, 557 P.2d 418 (1976); *People v. Ledford, supra.*

■ The General Assembly has addressed the question of restitution payments as a condition of probation by the adoption of section 16–11–204.5(1), 8 C.R.S. (Supp.1983), which statute contains the following pertinent language:

(1) As a condition of every sentence to probation, the court shall provide that the defendant make restitution *to the victim of his conduct for the actual damages which were sustained.* Such restitution shall be ordered by the court as a condition of probation. *The amount of such restitution shall be based on the actual, pecuniary damages sustained by the victim,* the ability of the defendant to pay, and the defendant's obligations to support his dependents and to meet other family obligations; except that the making of restitution may be waived totally if the court finds that such restitution will work an undue hardship on the defendant or his family. The court shall fix the manner and time of performance. (emphasis added)

In interpreting statutory language, appellate courts must give effect to the plain meaning of the words used by the legislative body. *People v. Owens*, 670 P.2d 1233 (Colo.1983). Section 16–11–204.5(1) restricts payments of restitution to "the victim." In this respect, the statute differs markedly from statutes in other jurisdictions which courts have construed as authorizing restitution payments as a condition of probation to those who suffer injury as the result of a defendant's criminal conduct but which contain no restrictive language regarding to whom such payments should be made. *See, e.g., Shenah v. Henderson*, 106 Ariz. 399, 476 P.2d 854 (1970) (defendant convicted of manslaughter required to make reparation payments of $2,500 to the parents of the deceased; Ariz. Rev.Stat.Ann. § 13–1657 (1956) authorized trial court to suspend imposition of sentence "upon such terms and conditions as the court determines."); *People v. Bond*, 99 Mich.App. 86, 297 N.W.2d 620 (1980) (defendant convicted of negligent homicide ordered to pay decedent's insurance company $4,145 as restitution for sums spent to repair automobile and for funeral expenses; Mich.Comp. Laws Ann. § 771.3 (Mich.Stat.Ann. § 28.1133(3) (Callaghan 1978)) authorized the imposition of restitution as a condition of probation "as the circumstances of the case may require or warrant, or as in its judgment may be proper."); *Flores v. State*, 513 S.W.2d 66 (Tex.Crim.App.1974) (defendant convicted of assault with intent to commit murder ordered to reimburse insurance company for amounts paid for victim's medical expenses; Tex.Code Crim.Proc. Ann. art. 42.12 § 6 (Vernon 1979) authorizes trial court, as condition of probation, to require defendant to "make restitution or reparation in any sum that the court shall determine."); *State v. Gunderson*, 74 Wash.2d 226, 444 P.2d 156 (1968), *overruled on other grounds, State v. Gosby*, 85 Wash.2d 758, 539 P.2d 680 (1975) (defendant convicted of negligent homicide ordered as condition of probation, to pay $7,500 as restitution to parents of victim; Wash.Rev. Code § 9.95.210 (1983) provides that the "court may ... require the defendant to make such monetary payments, on such terms as it deems appropriate under the circumstances, as are necessary ... to make restitution to any person or persons who may have suffered loss or damage by reason of the commission of the crime in question...."). *Cf. State v. Green*, 29

N.C.App. 574, 225 S.E.2d 170 (1976) (defendant convicted of manslaughter ordered to pay $50 per week to parents of his victim for five years; court held that restitution payments as conditions of probation did not constitute a prohibited use of the criminal process and cited no statutory authority).

Most state courts which have construed statutes using more restrictive language to limit restitution payments to "an aggrieved party" or to "the victim" have concluded that restitution may be paid only to the direct victim of the conduct alleged as the offense, and not to others who may also have sustained loss because of defendant's criminal conduct. *Montgomery v. State*, 292 Md. 155, 438 A.2d 490 (1981); [11] *People v. Grago*, 24 Misc.2d 739, 204 N.Y. S.2d 774 (1960); *State v. Stalheim*, 275 Or. 683, 552 P.2d 829 (1976); [12] *Commonwealth v. Galloway*, 302 Pa.Super. 145, 448 A.2d 568 (1982). *But see State* v. *Yost*, 232 Kan. 370, 654 P.2d 458 (1982).

Statutory construction in this area is far from uniform, of course. For example, the statutory phrase "the victim" has been construed to include the insurer of the direct victim of criminal conduct, *State v. Merrill*, 136 Ariz. 300, 665 P.2d 1022 (1983), and not to include the insurer of such direct victim. *Montgomery v. State, supra.* Moreover, in *State v. Morgan*, 646 P.2d 1177 (Mont. 1982), the Supreme Court of Montana concluded that two separate Montana statutes, one permitting "restitution" as a condition

of deferred sentencing, Mont.Code Ann. § 46–18–201(1)(a) (1983), and the other defining "victim" as a "person who suffers bodily injury or death as a result of ... criminally injurious conduct," Mont.Code Ann. § 53–9–103(6)(a) (1983), authorized an order requiring a defendant convicted of negligent homicide to make restitution payments to three injured passengers who survived an automobile accident in which two other passengers suffered fatal injuries.[13]

The federal statute defining the scope of probation, 18 U.S.C. § 3651 (1982), authorizes payments of "restitution or reparation to aggrieved parties" as a condition of probation. Federal courts construing this provision have generally recognized that restitution is authorized as a condition of probation only for "actual damages flowing from the specific crime charged in the indictment of which the defendant is convicted either after a trial or a plea of guilty." *United States v. Tiler*, 602 F.2d 30, 33 (2d Cir.1979). *See also United States v. Boswell*, 565 F.2d 1338 (5th Cir.), *cert. denied*, 439 U.S. 819, 99 S.Ct. 81, 58 L.Ed.2d 110 (1978); *United States v. Buechler*, 557 F.2d 1002 (3d Cir.1977). Thus, restitution has been disallowed when the amount of restitution exceeded the actual damages caused by the conduct charged as an offense, *United States v. Taylor*, 305 F.2d 183 (4th Cir.), *cert. denied*, 371 U.S. 894, 83 S.Ct. 193, 9 L.Ed.2d 126 (1962), and when ordered for the benefit of non-aggrieved parties, *United States v. Clovis Retail Liquor Dealers Trade Association*, 540 F.2d

**11.** The Maryland legislature subsequently amended its statute to authorize restitution to an insurance carrier as a condition of probation. *See* Md.Ann.Code art. 27 § 640 (1983 Supp.).

**12.** Subsequent to the *Stalheim* decision the Oregon legislature amended its statute to authorize restitution payments to more than one party as a condition of probation. *State v. Lewis*, 49 Or.App. 447, 619 P.2d 684 (1980). *See also* Or. Rev.Stat. § 137.103 (1983).

**13.** The *Morgan* court expressly noted a national trend of experimentation with various forms of restitution provisions in the context of criminal sanctions, and cited with approval the following commentary contained in the American Bar As-

sociation Standards for Criminal Justice concerning problems of defining the class of persons injured by crime to whom restitution payments may be ordered:

> As to the breadth of this class, courts have disagreed, although both sides of the debate recognize that a remoteness standard should be employed to disqualify some claimants whose injuries can only be said to have resulted from the defendant's conduct under a purely 'but for' test ... It is not the function of these standards to resolve these questions, but their existence shows the need for special legislative attention to the topic of restitution
> ....

3 *American Bar Association Standards for Criminal Justice* § 18–2.4 commentary at 18:114–15 (2d ed. 1982).

1389 (10th Cir.1976). *But cf. United States v. Follette*, 32 F.Supp. 953 (E.D.Pa. 1940) (defendant convicted of embezzling and converting United States Postal funds; court held that surety who at time of sentencing had paid funds to United States "to make good the embezzlement charged in indictment," is an aggrieved party who can receive restitution payments equal to the amount of funds defendant embezzled from the government).

The language of Colorado's statute is unambiguous. Payment of restitution is authorized only as to the victim of a defendant's conduct, and only for the actual pecuniary damage the victim sustained as the direct result of the defendant's conduct.[14] The language unequivocally states a legislative intent to authorize restitution payments only to the direct victims of criminal conduct—the person or entity whose injuries resulted from the conduct alleged as the basis for criminal proceedings against the defendant. Recognition of this relatively limited statutory authority to impose restitution payments has been articulated by our Court of Appeals. *People v. Catron*, 678 P.2d 1 (Colo.App.1983); *People v. Cera*, 673 P.2d 807 (Colo.App.1983); *People v. King*, 648 P.2d 173 (Colo.App. 1982). Further evidence that the authority under section 16–11–204.5(1) is relatively limited is gained from comparison of such statute with the broad provisions of section 19–3–113(3), 8 C.R.S. (Supp.1983), which authorizes courts conducting proceedings under the Juvenile Code to require children adjudicated as delinquents to pay "for any damage done to persons or property." *See People ex rel. P.J.N.*, 664 P.2d 245 (Colo. 1983). Moreover, while the General Assembly specifically authorized compensation to dependents of victims for purposes of the Colorado Crime Victim Compensation Act, section 24–4.1–108, 10 C.R.S.

(Supp.1983), it did not enact a similar provision in section 16–11–204.5.

Had the General Assembly intended to authorize trial courts to require adult probationers to make restitution payments to persons other than the direct victim of the conduct alleged as the defendant's criminal act, it would have used language more comparable to that contained in Colorado's Juvenile Code. Whatever the merits of a more expansive restitution policy, in the context of probation supervision, we are constrained to give full effect to the legislative policy of this state as articulated by the General Assembly. That policy, as indicated, is to limit the payment of restitution by adult probationers to the direct victims of the conduct of the defendant which is alleged as the basis for the criminal prosecution in question.

This conclusion, however, does not suggest that defendants who cause death may be relieved of payments in the nature of restitution to cover any reasonable costs and expenses necessarily incurred by the decedent. The statute contains no distinction between surviving and non-surviving victims, and there is no basis in the language or the purpose of the statute to warrant such distinction. Thus, expenses relating to such items as medical care, funeral arrangements, and property damage caused by the defendant's criminal conduct may well be the basis for an order of restitution to the estate or appropriate representatives of a decedent.

In this case, defendant was charged and convicted only of conduct causing the death of Sharon Bakovich. The trial court, therefore, had no statutory authority to require defendant, as a condition of probation, to make payments in the nature of restitution to the deceased's husband.

14. In *Cumhuriyet v. People*, 200 Colo. 466, 615 P.2d 724 (1980), we held that section 16–11–204(2)(e), 8 C.R.S. (1973), the then extant statute defining the conditions of probation, did not authorize an order requiring the payment of restitution as a condition of probation in the absence of evidence that asserted damages had been caused by the conduct which was the basis of the defendant's criminal conviction. For the purposes of the issue here considered, the present version of the statute does not differ materially from the predecessor statute.

However, the record does not disclose the basis for the trial court's calculation of the amount awarded as restitution. It may be that certain sums may be included as restitution to Sharon Bakovich, payable to her representative. Accordingly, the case is remanded to the trial court with directions to conduct such further proceedings concerning restitution as a condition of probation as may be appropriate.

The judgment of the trial court is affirmed in part and reversed in part and the case is remanded to the trial court for further proceedings consistent with this opinion.